# EXHIBIT A

California Corporate Agents, Inc.
16830 VENTURA BOULEVARD, SUITE 360
ENCINO, CALIFORNIA 91436
TELEPHONE 800 . 788 . 97 06
FACSIMILE 818.380.1908
www.cacorporateagents.com

Northwestern Polytechnic University
Peter Hsieh
47671 Westinghouse Dr.
Fremont, CA 94539

**For:    Northwestern Polytechnic University**
**State: CA**

**Enclosed are copies of legal process received by the statutory agent of the above company as**
**follows:**
**CASE NO: RG27886977**
**SUMMONS**
**RECEIVED IN PERSON ON 12/28/17 AT 2 PM**

Signed:   California Corporate Agents, Inc.
Per:        Nikki Steen
Address: 16830 Ventura Blvd., Suite 360
              Encino, CA 91436

Information contained on this transmittal form is recorded for California Corporate Agents, Inc.
record keeping purposes only and to permit quick reference for the recipient. This information does
not constitute a legal opinion as to the nature of the action, amount of damages, the answer date, or
any information that can be obtained from the documents themselves. The recipient is responsible for
interpreting the documents and for taking the appropriate action.

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

ENDORSED
FILED
ALAMEDA COUNTY

DEC 2 1 2017

CLERK OF THE SUPERIOR COURT
By: ERICA BAKER Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

NORTHWESTERN POLYTECHNIC UNIVERSITY, PETER HSEIH, PAUL CHOI, and DOES 1-50,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

ROHIT KALAKANTI, an individuals, on behalf of himself, the general public and those similarly situated,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Alameda County Superior Court, 1225 Fallon St., Oakland, CA 94612 | CASE NUMBER:<br>*(Número del Caso):*<br>**RG17886977** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Kristen Simplicio, Esq., Gutride Safier LLP, 100 Pine St., Ste 1250, San Francisco, CA 94111, 415-992-7549

| DATE: DEC 2 1 2017<br>*(Fecha)* | Chad Finke | Clerk, by<br>*(Secretario)* | | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☑ on behalf of *(specify):* NORTH WESTERN POLYTECHNIC UNIVERSITY

under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☑ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
☑ other *(specify):* UNKNOWN entity
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | |
|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Adam Gutride (SBN 181446); Kristen Simplicio (SBN 263291)<br>Gutride Safier LLP, 100 Pine St., Suite 1250, San Francisco, CA 94111<br><br>TELEPHONE NO.: 415-992-7549   FAX NO.: 415-449-6469<br>ATTORNEY FOR *(Name):* Rohit Kalakanti | ~~ENDORSED~~<br>**FILED**<br>**ALAMEDA COUNTY**<br><br>DEC 21 2017<br><br>CLERK OF THE SUPERIOR COURT<br>By: ERICA BAKER, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **Alameda**
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Rene C. Davidson

CASE NAME:
Kalakanti v Northwestern Polytechnic University, et al

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: RG17886977 |
|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [✓] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation**
*(Cal. Rules of Court, rules 3.400–3.403)*
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is [✓] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.[✓] monetary  b.[ ] nonmonetary; declaratory or injunctive relief  c.[✓] punitive
4. Number of causes of action *(specify):* five
5. This case [✓] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: December 21, 2017
Kristen Simplicio
(TYPE OR PRINT NAME)                                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

FILED BY FAX

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment *writ of attachment*. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

1   **GUTRIDE SAFIER LLP**
    ADAM J. GUTRIDE (State Bar No. 181446)
2   SETH A. SAFIER (State Bar No. 197427)
    KRISTEN G. SIMPLICIO (State Bar No. 263291)
3   100 Pine Street, Suite 1250
    San Francisco, CA 94111
4   Telephone: (415) 271-6469
    Facsimile:  (415) 449-6469
5
6   Attorneys for Plaintiff
7

ENDORSED
FILED
ALAMEDA COUNTY

DEC 2 1 2017

CLERK OF THE SUPERIOR COURT
By: ERICA BAKER. Deputy

FILED BY FAX

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF ALAMEDA

10  ROHIT KALAKANTI, an individuals, on behalf      Case No. **RG17886977**
    of himself, the general public and those similarly
11  situated,                                        UNLIMITED CIVIL CASE
12       Plaintiff,                                   CLASS ACTION COMPLAINT FOR
13                                                    VIOLATION OF THE CALIFORNIA
         v.                                           CONSUMERS LEGAL REMEDIES ACT;
14                                                    FALSE ADVERTISING LAW; COMMON
    NORTHWESTERN POLYTECHNIC                          LAW FRAUD, DECEIT, AND/OR
15  UNIVERSITY, PETER HSEIH, PAUL CHOI,              MISREPRESENTATION; NEGLIGENT
    and DOES 1-50,                                    MISREPRESENTATION,
16                                                    CONCEALMENT; BREACH OF
         Defendants.                                  CONTRACT; BREACH OF THE DUTY
17                                                    OF GOOD FAITH AND FAIR DEALING;
                                                      AND UNFAIR COMPETITION LAW
18
19                                                    JURY TRIAL DEMANDED
20
21
22
23
24
25
26
27
28

-1-

Class Action Complaint

**INTRODUCTION**

1.     Plaintiff Rohit Kalakanti, by and through his counsel, bring this class action against Defendants Northwestern Polytechnic University, Peter Hsieh, Paul Choi, and Does 1-50, inclusive, on behalf of himself, the general public, and those similarly situated, for violations of the Consumer Legal Remedies Act, Unfair Competition Law, and False Advertising Law, and for common law concealment, fraud, deceit and/or misrepresentation. The following allegations are based upon information and belief, including the investigation of Plaintiff's counsel, unless stated otherwise.

2.     Prior to and during the proposed Class Period, Northwestern Polytechnic University ("NPU") held itself out as an "accredited" educational institution under U.S. law. In reality, NPU knew that its accreditation was under federal investigation and in serious jeopardy of being revoked. NPU failed to disclose this fact to its students or prospective students, nearly all of whom were from India. NPU and its principals knew that its students and prospective students relied on its accreditation representation because without it, the students could not obtain visas to work in the United States after graduation, and thus would be unable to afford to repay their student loans.

3.     On December 12, 2016, the U.S. Department of Education concluded its investigation and revoked federal recognition for NPU's accrediting agency, the Accrediting Council for Independent Colleges and Schools ("ACICS"). As a result, NPU immediately lost its federally-recognized accreditation, making its students ineligible for visa extensions. The loss of accreditation also made the students' NPU degrees worthless if they wanted to pursue advanced study at other institutions. NPU refused to refund any of the tuition or fees paid by its students.

4.     Although holding itself out as a not-for-profit educational institution, NPU is run as a private business enterprise by the Hsieh family. The members of the Hseih family have personally directed and benefitted from NPU's misconduct, living lavishly in NPU-owned properties, at the expense of its defrauded students.

**PARTIES**

5.     Rohit Kalakanti ("Kalakanti" or "Plaintiff") is an individual and has been a

-1-

1   temporary resident of Warsaw, Indiana since October 2016. From May 2015 to October 2016,

2   Kalakanti resided in Fremont, California. He is a citizen of India.

3       6.      Defendant Northwestern Polytechnic University ("NPU") is a not for profit entity

4   incorporated under the laws of the State of California, having its principal place of business in

5   Fremont, California.

6       7.      Defendant Peter Hsieh is a resident of Fremont, California. He became the

7   president of NPU in September 2015. Prior to that time, he served as Executive Vice President

8   and as an officer on the governing board of NPU. He was the son of George Hsieh, who

9   previously ran the university.

10      8.      Defendant Paul Choi is a resident of Fremont, California. He has been the

11  executive vice president of NPU since January 2016. From August 2014 to January 2016, he was

12  the Chief Institutional Assessment Officer. Before then, he was a professor at NPU. He has been a

13  member of the governing board at NPU since 2015. He is the brother-in-law to Peter Hsieh.

14      9.      The parties identified in paragraphs 7-8 shall collectively be known as the "Hsieh

15  Family Defendants." Additional details about these defendants are detailed in Paragraphs 64-76.

16      10.     The true names and capacities of Defendants sued as Does 1 through 50, inclusive,

17  are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names pursuant to

18  section 474 of the California Code of Civil Procedure. Plaintiff will seek leave of Court to amend

19  this Class Action Complaint when said true names and capacities have been ascertained.

20      11.     The Parties identified in paragraphs 8-10 of this Class Action Complaint are

21  collectively referred to hereafter as "Defendants."

22      12.     At all times herein mentioned, the Hsieh Family Defendants were the alter egos of

23  NPU.

24      13.     At all times herein mentioned, each of the Hsieh Family Defendants was the agent,

25  servant, representative, officer, director, partner or employee of the other Defendants and, in

26  doing the things herein alleged, was acting within the scope and course of his/her/its authority as

27  such agent, servant, representative, officer, director, partner or employee, and with the permission

28  and consent of each Defendant.

-2-

Class Action Complaint

1      14.    At all times herein mentioned, each of the Defendants was a member of, and

2 engaged in, a joint venture, partnership and common enterprise, and acted within the course and

3 scope of, and in pursuance of, said joint venture, partnership and common enterprise.

4      15.    At all times herein mentioned, the acts and omissions of each of the Defendants

5 concurred and contributed to the various acts and omissions of each and all of the other

6 Defendants in proximately causing the injuries and damages as herein alleged.

7      16.    At all times herein mentioned, each of the Defendants ratified each and every act

8 or omission complained of herein.

9      17.    At all times herein mentioned, each of the Defendants aided and abetted the acts

10 and omissions of each and all of the other Defendants in proximately causing the damages, and

11 other injuries, as herein alleged.

12           **JURISDICTION AND VENUE**

13      18.    This action is brought by Plaintiff pursuant, *inter alia*, to the California Business

14 and Professions Code, section 17200, *et. seq.* Plaintiff and Defendants are "persons" within the

15 meaning of the California Business and Professions Code, section 17201.

16      19.    The injuries, damages and/or harm upon which this action is based, occurred or

17 arose out of activities engaged in by Defendants within, affecting, and emanating from, the State

18 of California.

19      20.    Defendants have engaged, and continue to engage, in substantial and continuous

20 business practices in the State of California, including in Alameda County. Defendants derive

21 substantial revenue from services provided to persons in the State of California.

22      21.    In accordance with California Civil Code Section 1780(d), Plaintiff will

23 concurrently files herewith a declaration establishing that NPU's principal place of business is in

24 Fremont, California. (The declaration is attached as Exhibit A.)

25      22.    Plaintiff accordingly allege that jurisdiction and venue are proper in this Court.

26           **SUBSTANTIVE ALLEGATIONS**

27 A.    **NPU Markets Itself As a University with Federally-Recognized Accreditation.**

28      23.    NPU has its only campus in Fremont, California. It enrolls approximately 6,000

*Class Action Complaint*

students each trimester, who are working towards Bachelors' and Masters' degrees in the areas of computer science, engineering, and business management.

24.    Until approximately the spring of 2017, NPU stated on its website:

Northwestern Polytechnic University is an academic institution accredited by the Accrediting Council for Independent Colleges and Schools (ACICS) to award bachelor's degrees, master's degrees, and doctorate degrees. ACICS is listed as a nationally recognized accrediting agency by the United States Department of Education and is recognized by the Council for Higher Education Accreditation.

https://web.archive.org/web/20150426163256/http://www.npu.edu:80/Accreditation.html (last accessed November 30, 2017). This representation even continued to appear on NPU's website for several months after the ACICS had been decertified as an accrediting agency and NPU had lost its federally-recognized accreditation.

25.    Since the spring of 2017, NPU's website has continued to include the first sentence of the quoted paragraph immediately above: that that it obtains accreditation from Accrediting Council for Independent Colleges and Schools (ACICS).

26.    At no time has NPU disclosed on its website that (1) ACICS was under investigation by the DOE, (2) federal recognition for ACICS as an accrediting agency was in jeopardy of being revoked, (3) NPU had no back-up plan to obtain accreditation from any other federally recognized accrediting agency if the DOE revoked its recognition of ACICS as an accrediting agency, (4) if accreditation was revoked, students would be unable to obtain visa extensions or use NPU degrees to pursue higher degrees at other institutions, (5) the DOE did in fact revoke federal recognition for ACICS in December 2016, or (6) NPU is no longer accredited by any federally recognized accrediting agency.

**B.    NPU Targeted Its Marketing To Indian Students Who Relied On NPU's Representation Of Federally-Recognized Accreditation In Choosing to Enroll.**

27.    Beginning in 2013, NPU began aggressively recruiting potential students in India. To reach these prospective students, NPU invests heavily in overseas recruiters and consultants. Recruiters are paid by NPU to make presentations about the school to key target audiences and visit undergraduate campuses to provide information directly to students. Education consultants are individuals and organizations who provide assistance to those trying to understand their

-4-

1  educational options. Prospective students can hire consultants to review their standardized test
2  scores, transcripts, resumes, and other materials, and make recommendations on schools that
3  might be a good fit for their qualifications and goals. NPU pays these consultants 15% of the first
4  year tuition for every admitted student they referred to the school. NPU instructs the recruiters
5  and consultants to highlight to prospective students that an NPU degree can enable post-graduate
6  employment in the technology sector in the United States.

7        28.     NPU's marketing efforts have been highly successful. In the 2014-15 academic
8  year, NPU sponsored 9,026 F-1 visas for students to attend school for at least one trimester or to
9  participate in job training programs described below. As of 2016, approximately 95% of NPU's
10  students were Indian nationals.

11        29.     NPU knew that the key to attracting foreign students was to have federally-
12  recognized accreditation. Schools with such accreditation have the automatic right to issue Form
13  I-20s to foreign students, which those students need to obtain F-1 visas to study in the United
14  States. Only a degree from a school with such accreditation can be used to pursue a many
15  graduate or post-graduate degrees in U.S. and most other countries. In addition, degrees from
16  schools with such accreditation can more readily be used to support either an F-1 visa extension
17  or an H1-B visa, so that the students can work in the United States after graduation.

18        30.     The Optional Practical Training job training program ("OPT") allows students to
19  extend their F-1 visas for one year. Students who have degrees in science, technology, and math
20  from schools with federally-recognized accreditation may obtain a second extension on their F-1
21  visa for an additional two years as part of the OPT STEM Extension program. Federal law
22  permits international students only one opportunity to participate in the OPT program, regardless
23  of the number of educational programs they complete. Thus, the school from which the student
24  graduated must remain accredited for the entire duration of the OPT eligibility for the student to
25  obtain the full benefit of that program.

26        31.     H1-B guest worker visas are available under a separate visa lottery, if the applicant
27  is sponsored by a U.S. based employer. The H1-B is only available if the applicant's prospective
28  employer shows that the applicant has skills beyond those available from U.S.-based workers.

-5-

Class Action Complaint

1  Applicants who hold degrees from schools with federally-recognized accreditation will be better

2  able to compete in the H1-B lottery than those individuals who do not hold such degrees.

3      32.    Because federally-recognized accreditation was so important to students' decisions

4  as to whether to attend NPU, the school prepared marketing materials highlighting it and

5  instructed its recruiters and consultants to tell students about its accreditation. For example, in a

6  one-page document summarizing talking points that recruiters should use when pitching to

7  prospective students in India, NPU highlighted the fact that it was "nationally accredited" and

8  also stated "U.S Government: Department of Education recognized institution of higher

9  education."

10      33.    NPU also knew that its students relied on the representation of federally-

11  recognized accreditation, in order to be able to earn enough money to repay loans incurred for

12  NPU tuition, fees, and living expenses. The NPU tuition, fees and living expenses far exceeded

13  the amounts that would be incurred to obtain a similar degree in India. But making students

14  eligible for F-1 visa extensions and H-1B visa sponsorship, the federally recognized accreditation

15  would allow NPU graduates to seek employment in the U.S. Because U.S. salaries are much

16  higher than those available in India, the students could repay the debt incurred for their U.S.

17  education. And upon eventually returning to India, their accredited degrees (and U.S. work

18  experience) could help them command higher salaries there as well. NPU knew that students

19  would be ineligible for the OPT extensions unless NPU continued to have federally recognized

20  accreditation on the date of the students' applications for those extensions (which were due

21  around the time of graduation and then again one year later).

22      34.    Because short term employment at U.S. based companies is so important to NPU's

23  students, NPU heavily markets its ties to Silicon Valley employers. For example, on NPU's

24  website, it states:

25      Because Silicon Valley continually demands a multitude of electronics, computer,
    and business professionals, NPU aims to prepare individuals to achieve the

26      proficiency necessary for quality work in the high-technology industry. Silicon
    Valley's most pressing needs are for hardware and software design engineers,

27      software application specialists, networking experts, managers trained in the
    application of computers to business, and business personnel familiar with

28      entrepreneurship and venture business management. While training students to

1    meet these needs quickly, NPU's emphasis is on quality and integrity in the
     education.

2    NPU provides a unique educational culture and learning environment for students
3    because NPU has been able to attract a strong pool of talented individuals from
     Silicon Valley to teach, conduct research, and provide student services. The
4    abundance of talent and technical resources in Silicon Valley has also provided
     NPU with a unique student body. A significant percentage of the student
5    population already works in high-tech industries, which makes the teaching and
     learning even more interesting.

6    http://www.npu.edu/about-npu (last accessed November 28, 2017). Because nearly everyone who

7    attends NPU will require visas to work in Silicon Valley, statements such as this one

8    communicate to prospective and current students that the school has and will continue to have

9    federally-recognized accreditation.

10
11   **C.      NPU Knew Its Accreditation Was In Jeopardy When It Advertised Itself As
             Accredited.**

12       35.      As explained in more detail below, NPU knew ACICS was under federal

13   investigation and because of that fact, NPU was in danger of losing its accreditation at all times

14   during the class period.

15       **1.      Overview of the Higher Education Accreditation Process.**

16       36.      Higher education accreditation is a quality assurance process under which

17   education institutions are evaluated by an external body to determine if various quality standards

18   are met. In the United States, private accreditation agencies conduct those evaluations. Those

19   private accreditation agencies may, in turn, apply for formal recognition with the United States

20   Department of Education ("DOE").

21       37.      Federally-recognized accreditation agencies must meet certain standards and

22   employ rigorous quality control in evaluating educational institutions. The agencies must comply

23   with reporting requirements and submit to periodic reviews by the DOE. If the DOE revokes

24   federal recognition of an accreditation agency, the schools accredited by the agency lose their

25   federally-recognized accreditation.

26       38.      Obtaining and maintaining federally-recognized accreditation is an expensive and

27   lengthy undertaking. Schools seeking a new accreditation agency typically find that the process

28   takes a minimum of eighteen months, and could take well over three years. The costs are

-7-

Class Action Complaint

1   compounded by monitoring and reporting requirements. Because accreditation usually requires

2   the school maintain a certain level of full-time faculty and an adequate library and other academic

3   resources, schools that have federally-recognized accreditation typically cost more to attend than

4   schools without it.

5            **2.**     **NPU Knew That Its Accreditation Agency Was Under Intense Scrutiny.**

6        39.     Throughout the Class Period, NPU knew that its federally-recognized accreditation

7   was at risk.

8        40.     As early as 2011, DOE raised concerns over renewing ACICS's status. It initially

9   withheld such approval pending additional compliance monitoring. NPU was informed of the

10   DOE action through communications with ACICS and industry publications, including an article

11   on June 9, 2011 in "Inside Higher Ed," entitled "More Scrutiny for Accreditors," which described

12   DOE concerns that ACICS did not have appropriate "benchmarks for student success."

13        41.     Although DOE decided to renew ACICS's status in 2011, things continued to get

14   worse for ACICS. ACICS was at the center of governmental investigations into colleges and

15   universities that were alleged to have misled students, saddling them with mountains of debt and

16   leaving them with worthless degrees. For example, government regulators exposed widespread

17   fraud at Corinthian Colleges, a sprawling nationwide network of schools and campus that offered

18   higher educational programs in a variety of fields. Soaring rates of drop outs and student loan

19   defaults, brought on by misleading representations to students and low-quality instruction,

20   triggered litigation from students, numerous attorneys general, and the Consumer Financial

21   Protection Bureau. NPU was aware of these investigations from communications with ACICS

22   and news reports.

23        42.     After Corinthian Colleges shut down, was fined $30 million by the DOE, and filed

24   for bankruptcy in 2015, scrutiny turned to ACICS—which had accredited Corinthian Colleges—

25   for its lax oversight and shoddy quality control. State investigators, the Consumer Financial

26   Protection Bureau, and various House and Senate Committees opened investigations, held

27   hearings, and subpoenaed documents. For example, on June 17, 2015, a hearing of the Senate

28   Committee on Health, Education, Labor and Pensions was held, and Albert Gray, chairman of

-8-

1   ACICS was questioned at length. Senators expressed concern that ACICS continued to accredit

2   the very schools that were being sued for fraud by various attorneys general. Media attention was

3   given to Senator Elizabeth Warren's questioning of ACICS's decision to continue to accredit

4   Corinthian Colleges despite the fact that twenty attorney generals and one federal agency had

5   filed lawsuits against it.

6          43.     NPU was fully aware of the investigation into ACICS in the wake of the

7   Corinthian Colleges scandal, from numerous reports in mainstream media and industry

8   publications. For example, *Inside Higher Ed* ran articles about the Senate and CFPB investigation

9   into ACICS, including articles on October 29, 2015, November 6, 2015, and November 17, 2015.

10  The November 17 article, which was entitled "Challenges of an Accreditor Crackdown,"

11  specifically warned that that the DOE may soon revoke recognition of ACICS, and summarized

12  the contentious Senate questioning of ACICS.

13         44.     Corinthian was not the only ACICS backed-school in hot water. Several other

14  ACICS-backed schools settled litigation brought by federal agencies, state attorney generals, and

15  private litigants. Herguan College in Sunnydale, California was shut down and its Chief

16  Executive Officer went to prison for conspiracy to commit visa fraud in connection with his

17  efforts to enroll international students into sham educational programs. Daymar College, National

18  College, and Spencerian College were sued by the Kentucky attorney general in 2011 and 2013,

19  respectively. Lincoln Technical Institute and Salter College settled with the Massachusetts

20  attorney general. Daymar College also settled fraud claims brought by the Pennsylvania Attorney

21  General. NPU was aware of these developments based on media reports, industry publications,

22  and communications with ACICS and others.

23         45.     On May 29, 2015, at its annual conference, which representatives from NPU

24  attended, the chair of ACICS, John Euliano, warned its members that accreditation might be

25  revoked even for the schools ACICS accredited that were providing high quality educations:

26      Trust me, accreditation has little ability to mitigate political risk. In fact, some
        schools with quality programs have been shuttered primarily because they were
27      subject to political risk. The sources of the political risk do not care (nor can they
        discern) a good school from a bad one. They lack the tools and expertise to

28

-9-

Class Action Complaint

1    determine which students are getting value from their investment versus those
     who are not. In general, political risks manifest as a meat cleaver, not a scalpel.

2    http://www.acics.org/news/content.aspx?id=6381 (last accessed November 30, 2017).

3        46.     NPU also knew that ACICS was not taking sufficient steps to allay regulators'

4    concerns. For example, it knew that instead of distancing itself from the failed, corrupt schools,

5    ACICS had hired those schools' executives, such as in 2014, when ACICS hired Beth Wilson as a

6    commissioner. Ms. Wilson had previously served as the executive vice president at Corinthian

7    Colleges, where she had ordered staff there to falsify job placement rates. NPU and its leadership

8    knew about the suspicious hiring and Ms. Wilson's background from media reports and industry

9    publications, including an article in the March 18, 2016 issue of the *Chronicle of Higher*

10   *Education* and ACICS's written response to that article.

11       47.     In March 2016, DOE published a notice in the Federal Register requesting

12   comments on whether it should revoke its recognition of ACICS's status. Thirteen state attorneys

13   general called for the revocation of ACICS's status by the DOE, as did twenty-three public

14   interest organizations, including consumer groups, veterans' groups, and education advocates. On

15   June 15, 2016, the National Advisory Committee on Institutional Quality and Integrity

16   ("NACIQI"), a division of the DOE, issued a recommendation to deny ACICS's petition for

17   renewal of recognition and withdraw the agency's recognition. NPU learned of each of these

18   developments soon after they occurred from ACICS's membership distribution lists and stories

19   in the *Chronicle of Higher Education*, *Inside Higher Ed*, and other publications.

20       48.     In May 2016, in response to the massive number of investigations and lawsuits

21   that its schools were experiencing, ACICS held conference with its schools, including NPU, to

22   discuss how to evade such lawsuits. ACICS encouraged these schools to reduce transparency to

23   limit what outside compliance monitors would be able to access. ACICS reasoned that if

24   compliance monitors could not see the data, they would not be able to find problems with it. NPU

25   thus had further reason to doubt ACICS's commitment to quality control and the likelihood that

26   the government would revoke its status.

27

28

49.     On July 1, 2016, California's Bureau for Private Postsecondary Education wrote to all California-based schools accredited by ACICS, including NPU, to inform it of the risks of ACICS losing its federal recognition.

50.     NPU did not begin to search for a back-up accreditation agency until well into 2016, even though it knew that the process for accreditation would take several years to complete. It did not hire a Chief Academic Officer, one of the requirements for such accreditation, until September 2016.

51.     On September 22, 2016, the DOE wrote to ACICS to inform it that it had considered the recommendations of NACIQI as well as other DOE staff members and the full record before it. It informed ACICS that it had decided to terminate DOE's recognition of ACICS as a nationally recognized accrediting agency. In particular, DOE found that ACICS was out of compliance in 21 different areas and noted that ACICS had not addressed problems it had known about for years. This issue was communicated to NPU via ACICS's membership distribution lists, a September 22, 2016 letter from California's Bureau for Private Postsecondary Education that was sent to NPU, and published in the *Chronicle of Higher Education*, *Inside Higher Ed*, and other periodicals read by Defendants.

52.     ACICS appealed the September 22, 2016 decision to the Secretary of the DOE, who in turn denied that appeal on December 12, 2016.

**3.      NPU Continued to Hold Itself Out As Accredited to Its Students While Concealing The Risks It was Facing.**

53.     During the entire period when ACICS was under scrutiny from 2011 until December 22, 2016, NPU withheld from its students and prospective students *any information about the problems with its accrediting agency or the risk or likelihood that its federally-recognized accreditation would be lost*. It therefore made no disclosures to students (1) in connection with the 2013-2015 investigations into Corinthian Colleges and many other ACICS-accredited institutions, (2) after DOE proposed revocation in March 2016, (3) after the June 2016 advisory opinion by DOE, (4) after the July 2016 notice from the state of California, or (5) after the September 2016 DOE action. Instead, NPU continued to represent that it had federally-

-11-

Class Action Complaint

1    recognized accreditation without qualification on its website, marketing materials, and internal

2    communications with students; and it failed to notify students that its accreditation was in

3    jeopardy, which would have enabled those students to choose not to enroll or complete their

4    programs, seek to transfer to other universities, or make different decisions with respect to post-

5    graduate employment. Despite knowing for months or years that it may not be accredited by the

6    time students seek to transfer to other universities, complete their programs, apply for jobs and

7    graduate programs, and apply for visas, NPU also continued to enroll additional students at an

8    increasingly fast pace. In 2013, NPU had approximately 1,634 students attending or enrolled in

9    OPT programs; by 2015, that number had jumped to 9,024 students.

10         54.    NPU concealed information about the serious risk that it would lose its

11   accreditation, despite knowing that its students and prospective students would likely be unaware

12   of the information. NPU knew that its foreign students were unlikely to understand the

13   complicated regulatory scheme governing accreditation or the interplay between federal agencies

14   and private accreditations firms such as ACICS. It also knew that NPU students and prospective

15   students were not receiving updates directly from ACICS, attending ACICS or industry

16   conferences, subscribing to industry publications. It knew that the scandals involving ACICS was

17   unlikely to be covered by media in India, or by the overseas editions of U.S. media (such as CNN

18   or the New York Times). Finally, it knew that even if students and prospective students

19   discovered information about ACICS, they would have little way of knowing whether the

20   scandals involving *for-profit* colleges (such as Corinthian Colleges) would have any effect on

21   purportedly *not-for-profit* colleges (such as NPU). For example, a search on CNN's website

22   shows that ACICS was mentioned three times in 2016, but all within the context of complaints

23   about *for profit* schools.

24         55.    NPU informed the class via an email that it had lost its federally-backed

25   accreditation for the first time on December 22, 2016 – ten days after its accreditation had been

26   lost.

27         56.    In the December 22 announcement, NPU continued to try to mislead the class as to

28   the significance of the loss of accreditation, in order to minimize complaints and to prevent

-12-

1    current students from attempting to transfer. For example, NPU falsely advised class members

2    that "there will be no impact upon ACICS-accredited institutions or their students for the next 18

3    months." It was not until April 25, 2017 that NPU informed class members that to be eligible for

4    the OPT STEM extension program for the first year, interested students had to have applied for it

5    *before* NPU lost its federally-recognized accreditation on December 12, 2016. And even if

6    students had so applied, they would not be eligible for the additional two years of extension.

7        57.     In the December 22, 2016 email, NPU also assured the class that it had "strong

8    contingency plans." NPU did not tell the class that they would not benefit from those

9    "contingency plans," because it would be years before NPU would be able to secure federally-

10    recognized accreditation, and any degrees earned prior to that renewed accreditation would be

11    worthless—unusable for further study at other universities or to support visas to remain or work

12    in the United States. It was not until October 31, 2017 that Defendants finally told the class that it

13    would not obtain federally-recognized accreditation until 2019 at the earliest.

14        58.     NPU knew and intended that Plaintiff and Class Members would rely upon its

15    misrepresentations and omissions by (1) enrolling in and paying money to NPU, (2) paying for F-

16    1 visas and for travel expenses to and living expenses in the United States, (3) borrowing money

17    to finance such expenses, (4) choosing not to transfer to other universities that had federally

18    recognized accreditation, and (5) choosing not to defer their OPT visa extension applications until

19    after completion of studies at a different university, where they could have obtained the full three-

20    year OPT STEM extension.

21    **D.    The Class Was Misled and Damaged as a Result of NPU's False Advertising.**

22        59.     Class members were damaged by NPU's misrepresentations. As a result of NPU's

23    deception about its accreditation status, they were denied the benefits of attendance at a federally-

24    recognized accredited institution, even thought they had completed the coursework and paid a

25    premium for their tuition. As of December 12, 2016, thousands of students were enrolled at NPU

26    and thousands more had just graduated.

27        60.     Tuition at NPU is paid on the trimester system. Class members in the

28    undergraduate program were charged at least $3,960 for a 12-unit trimester and required to

1   complete 120 units (ten trimesters, or 2.5 years), for a total cost of roughly $39,600. Class

2   members in the masters degree program were charged at least $4,050 per trimester and required

3   to complete five or six trimesters (1.25 to 1.5 years), for a total cost of at least $20,250 to

4   $25,300. Class members also paid NPU for books, health insurance, and other administrative

5   fees, so the per semester cost was often over $5,000. In addition, class members relocated to the

6   United States, incurring travel and moving costs, and they paid to live in the very expensive San

7   Francisco Bay area, where even students who lived frugally in shared housing arrangements spent

8   at least $1,000 per month for the duration of their studies to cover rent, groceries and other living

9   expenses, or at least $30,000 for undergraduates and $15,000 to $18,000 for graduate students, far

10  more than they would have spent had they remained in India.

11          61.     Because international students are not eligible for U. S. federal student loan

12  programs, members of the class had to obtain other financing. A typical loan from an Indian

13  financial institution to cover the costs of attending NPU would bear an interest rate of ten percent

14  or more, impose a five-year repayment term that begins on the date of graduation, and be fully

15  secured by property or other collateral in India, such as the family home of the student.

16          62.     Because of the high cost of attending, compounded by onerous repayment terms,

17  the loss of federally-recognized accreditation was financially disastrous for the class. Without

18  access to F-1 visa extensions or H-1B visas, students cannot earn money at U.S. salaries as they

19  reasonably would have expected to be able to do, and Indian salaries are not high enough to

20  permit repayment of the student loans. NPU graduates might earn $60,000 per year for computer

21  science jobs in the United States but similar positions in India pay only around $10,000.

22          63.     Class members were also harmed in other ways. Had NPU disclosed the truth,

23  class members could have enrolled in or transferred to other institutions or taken paying jobs in

24  India, in lieu of spending money to pursue their now-worthless degrees.

25      **C.      Defendants Profited From Their Scheme.**

26          64.     NPU and the Hseih Family Defendants have profited enormously from NPU's

27  false advertising scheme.

28

---

-14-

Class Action Complaint

65.    In 2013, after NPU began employing recruiters in India to advertise its programs to prospective students, its enrollment and revenues increased substantially. In 2013, NPU earned $12.8 million in revenues, which jumped to $39.7 million in 2014 and $72.4 million in 2015. Yet despite enrolling thousands more students, its total expenses, as reported to the IRS, increased much more slowing, going only from $7.4 million to $10.9 million to $19.4 million, which has left the school with millions of dollars in profit. In 2015, its profit margin was 72%.

66.    Although NPU is registered as a not-for-profit organization, it did not invest these profits back into the university, as would be required under IRS regulations and state law. Instead, NPU has and the Hseih Family Defendants have taken steps to evade federal and state law, co-mingling assets and ignoring corporate formalities, for the gain of the Hseih Family Defendants.

67.    NPU and the Hsieh Family Defendants maintained that NPU was a not-for-profit organization (even though it was actually organized to benefit the Hsieh Family Defendants) in order to further their fraudulent acts against Class Members. Only nonprofit schools can participate in the STEM OPT program, so holding itself out as a nonprofit allowed NPU to recruit more foreign students, who depend on the STEM OPT to obtain work in the United States after graduation to earn enough to repay their loans. Further, nonprofit universities are subject to less stringent DOE regulatory and reporting requirements than for-profit universities, so NPU was able to divert money from student services to the pockets of the Hsieh Family Defendants. In addition, NPU avoided federal and state income taxes on profits that would be due as a for-profit institution, diverting that additional money to the Hsieh Family Defendants.

68.    As a not-for-profit organization, NPU is required to maintain an independent board to oversee finances and management and protect student interests. But NPU's board is not independent. Rather, NPU has had a three person board of directors led by a member of the Hsieh family. Until September 2015, that board was headed by George Hsieh, who been an employee and President of NPU since 1991. In 2014 and 2015, the only two other board members were NPU professors who served as secretary and treasurer. Because all three individuals were employees of NPU and thus on its payroll, the board was not independent. In addition, the two

-15-

Class Action Complaint

1    professors' employment was controlled by George Hsieh, who could have terminated their

2    employment if they voted against his wishes.

3         69.    In March 2015, when George Hsieh retired, he nominated as board chair his wife

4    Wen Hsieh and selected his son Defendant Peter Hsieh to take over as President. This decision

5    was unanimously approved by the three-person board consisting of George Hsieh and his two

6    employees.

7         70.    Because non-profit boards are supposed to be independent, non-profit board

8    members typically do not receive compensation for their service on the board to guard against

9    personal financial interests influencing board members' decision making. Accordingly, the two

10   professors received no such compensation in 2014. However, on March 14, 2015, the same day

11   the two professors voted to approve the appointments of Defendant Peter Hsieh and Defendant

12   Wen Hsieh, both received checks for $2,500 from NPU with the subject line "Gratitude / meeting

13   fee."

14        71.    Three member non-profit boards are particularly unusual for larger non-profits,

15   like educational institutions that enroll thousands of students. NPU and the Hseih Family

16   Defendants chose the board structure to permit the Hsieh Family Defendants to control NPU and

17   use  NPU assets for their own personal gain.

18        72.    Like its board, NPU's management is also not independent. Rather, as set forth in

19   Paragraphs 8-9, members of the Hsieh family are employed in a number of leadership positions.

20   George Hsieh served as President from 1991 to 2015, and his son Peter began as Executive Vice

21   President in 2013 before he assumed the President position. Family members also are employed

22   in lower level positions; for example, Defendant Peter Hsieh's wife, Sunny Oh, received $60,000

23   as an independent contractor in 2015.

24        73.    Federal law requires that non-profit organizations publicly disclose certain

25   categories of information, including how much the organization spent on compensation generally,

26   and specific salaries for their highest paid employees. To avoid these reporting requirements,

27   NPU and the Hsieh Family Defendants decided to have NPU pay salaries that are unlikely to raise

28

-16-

Class Action Complaint

1   suspicion, but then to permit the Hsieh Family Defendants to use NPU's assets as their personal

2   slush funds, rather than invest those assets back into the educational mission of the organization.

3        74.    For example, in December 2013, two months after contracting to hire Defendant

4   Peter Hsieh full time, NPU purchased a $2.2 million house. Defendant Peter Hsieh and his family

5   moved in. That year, NPU also purchased a $1.5 million house, in which Defendant Paul Choi

6   resides. NPU has also purchased numerous other properties in Fremont and Mountainview; it is

7   believed that other members of the Hsieh family reside in these homes. NPU did not disclose

8   these homes as expenses to the IRS.

9        75.    The Hseih Family Defendants also frequently use university funds for personal

10  expenses. An investigation by one media source found hundreds of the Hseih Family Defendants'

11  day to day expenses charged to the NPU, for everything from grocery runs at Trader Joe's to

12  Starbucks' coffee. The same investigation discovered that NPU purchased for Defendant Paul

13  Choi $1,200 in Ikea furniture and a $150 toilet seat from Home Depot.

14       76.    There is a unity of interest and ownership between the NPU and the Hsieh Family

15  Defendants, and it would be unfair if the acts of NPU described herein are treated as those of the

16  corporation alone.

17                    **PLAINTIFF'S EXPERIENCE**

18       77.    In 2014, Kalakanti was in Hyderabad, India. He had completed his bachelor's

19  degree, and had an interest in continuing his education in engineering. He was particularly

20  interested in working in the technology industry, and knew that a master's degree from a United

21  States institution and work experience in Silicon Valley would help him find the best

22  opportunities for permanent employment.

23       78.    During that time, he spoke with education consultants in India about his options

24  for schooling in the United States. He was aware of the OPT program and sought out a school

25  where participation in that program would be an option. He worked with a consultant in India

26  who was paid by NPU and who told him that NPU had federally-recognized accreditation, which

27  he knew he would need to obtain the necessary visa to student in the United States and to have the

28  benefits of being able to work for 2-3 years after his program, due to the fact that such

1   accreditation would qualify him for OPT and the STEM extension.

2   79.     He applied for acceptance into NPU's masters' of electrical engineering program

3   in September 2014. He was admitted in February 2015, and began attending classes in May 2015.

4   NPU issued a Form I-20 to Kalakanti, so that he could apply for the F-1 visa, allowing him to

5   enter the United States to attend classes at NPU.

6   80.     To pay for his education at NPU, Kalakanti borrowed money from family

7   members in India. His family in the United States also lent him money to help cover his living

8   expenses.

9   81.     *Kalakanti completed his Master's degree program in August 2016.* At the time he

10  had completed the program, he had borrowed approximately $21,000 from family members in

11  India to pay for tuition, which he will have to repay. He also spent approximately $20,000 in

12  living expenses while studying, which he will also have to repay to family.

13  82.     In August 2016, Kalakanti secured employment in the United States, and applied

14  for and began his 12 month OPT.

15  83.     While a student at NPU, NPU maintained an online portal, which it used to publish

16  communications to students. Because the portal included information about class schedules,

17  registration, tuition payment, and other important issues, Kalakanti logged into the portal

18  regularly throughout his time at NPU and reviewed the communications from the school and his

19  instructors. *At no time prior to or during his time at NPU did Kalakanti receive any*

20  *communications from NPU about NPU's accreditation being in jeopardy.*

21  84.     It was not until December 22, 2016 that Kalakanti learned that NPU had lost its

22  accreditation. In the months that followed, Kalakanti learned that he was ineligible for the STEM

23  extension because NPU had lost its federally-recognized accreditation.

24  85.     Had NPU informed him during the application process that that its federally-

25  recognized accreditation was in jeopardy, Kalakanti would not have chosen to attend NPU. Had

26  NPU informed him after his enrollment in the program that its federally-recognized accreditation

27  was in jeopardy, Kalakanti would have transferred to another university with federally-recognized

28  accreditation, or pursued a second or advanced degree at such a university rather than initiating

-18-

Class Action Complaint

1   the OPT program, so that he would have had the opportunity to participate in the three year OPT

2   program after completion of his studies.

3        86.    Kalakanti relied to his detriment on NPU's representations and omissions.

4        87.    Plaintiff continues to desire to receive an education from a federally-recognized

5   accredited institution. If Defendants are able to obtain such accreditation, Plaintiff would consider

6   enrolling in additional degree programs again in the future. But Plaintiff is not privy to

7   information in the hands of Defendants as to whether they are taking reasonable steps to ensure

8   continuity of accreditation (such as, for example, using only accrediting agencies that are not

9   under federal investigation and/or having a backup accreditation agency). Plaintiff will be unable

10  to rely on Defendants' accreditation representations in the future absent an injunction that

11  prohibits Defendants from advertising their institution as "accredited" unless Defendants are

12  taking such reasonable steps. Thus, Plaintiff is likely to be repeatedly presented with false or

13  misleading information when looking for future educational opportunities, making it difficult to

14  make informed decisions.

15                        **CLASS ALLEGATIONS**

16       88.    Plaintiff brings this action against Defendants, on behalf of himself and all others

17  similarly situated, as a class action pursuant to section 1781 of the California Civil Code. Plaintiff

18  seeks to represent the following groups of similarly situated persons, defined as follows:

19            All persons who were enrolled in educational programs at NPU on or after
           September 12, 2015.

20       89.    This action has been brought and may properly be maintained as a class action

21  against Defendants because there is a well-defined community of interest in the litigation and the

22  proposed class is easily ascertainable.

23       90.    Numerosity:  Plaintiff does not know the exact size the Class, but it is composed of

24  more than 1000 persons. The persons in the Class are so numerous that the joinder of all such

25  persons is impracticable and the disposition of their claims in a class action rather than in

26  individual actions will benefit the parties and the courts.

27       91.    Common Questions Predominate:  This action involves common questions of law

28  and fact to the potential classes because each class member's claim derives from the deceptive,

-19-

Class Action Complaint

1   unlawful and/or unfair statements and omissions that led consumers to believe that the

2   educational programs offered by Defendants were accredited by a federally recognized

3   organization and that accreditation would not be lost. The common questions of law and fact

4   predominate over individual questions, as proof of a common or single set of facts will establish

5   the right of each member of the Class to recover. The questions of law and fact common to the

6   Class are:

7       a)   whether NPU unfairly, unlawfully and/or deceptively misrepresented that its

8           educational programs were accredited by a federally recognized accrediting

9           agency;

10      b)   whether the use of the word "accredited" is misleading when NPU knows

11          that the accreditation is at risk of being lost;

12      c)   whether NPU knew or should have known that its federally-recognized

13          accreditation was in jeopardy;

14      d)   whether NPU had a duty to disclose that its federally-recognized

15          accreditation was in jeopardy;

16      e)   whether NPU's advertising and marketing regarding the status of its

17          accreditation was likely to deceive the class members and/or was unfair;

18      f)   whether NPU's advertising and marketing regarding the status of its

19          accreditation was unlawful pursuant to 34 C.F.R. 668.72(a);

20      g)   whether the Hsieh Family Defendants are alter-egos of NPU;

21      h)   whether Defendants engaged in the alleged conduct knowingly, recklessly,

22          or negligently;

23      i)   the amount of profits and revenues earned by Defendants as a result of the

24          conduct;

25      j)   whether class members are entitled to restitution, injunctive and other

26          equitable relief and, if so, what is the nature (and amount) of such relief;

27          and

28      k)   whether class members are entitled to payment of actual, incidental,

1    consequential, exemplary and/or statutory damages plus interest thereon,

2    and if so, what is the nature of such relief.

3    92.    Typicality: The claims of Plaintiff is typical of the Class because they attended

4    NPU in reliance on *its misrepresentations and omissions that the institution was accredited by a*

5    federally-recognized accrediting organization. Thus, Plaintiff and the class members sustained the

6    same injuries and damages arising out of Defendants' conduct in violation of the law. The injuries

7    and damages of each class member were caused directly by Defendants' wrongful conduct in

8    violation of law as alleged.

9    93.    Adequacy: Plaintiff will fairly and adequately protect the interests of all class

10   members because it is in their best interests to prosecute the claims alleged herein to obtain full

11   compensation due to them for the unfair and illegal conduct of which they complain. Plaintiff also

12   has no interests that are in conflict with, or antagonistic to, the interests of class members.

13   Plaintiff has retained highly competent and experienced class action attorneys to represent him

14   interests and that of the classes. By prevailing on their own claims, Plaintiff will establish

15   Defendants' liability to all class members. Plaintiff and their counsel have the necessary financial

16   resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are

17   aware of their fiduciary responsibilities to the class members and are determined to diligently

18   discharge those duties by vigorously seeking the maximum possible recovery for class members.

19   94.    Superiority: There is no plain, speedy, or adequate remedy other than by

20   maintenance of this class action. The prosecution of individual remedies by members of the

21   classes will tend to *establish inconsistent standards of conduct for Defendants and result in the*

22   impairment of class members' rights and the disposition of their interests through actions to

23   which they were not parties. Class action treatment will permit a large number of similarly

24   situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

25   and without the unnecessary duplication of effort and expense that numerous individual actions

26   would engender. Furthermore, as the damages suffered by each individual member of the classes

27   may be relatively small, the expenses and burden of individual litigation would make it difficult

28   or impossible for individual members of the class to redress the wrongs done to them, while an

-21-

Class Action Complaint

1   important public interest will be served by addressing the matter as a class action.

2      95.   Plaintiff is unaware of any difficulties that are likely to be encountered in the

3   management of this action that would preclude its maintenance as a class action.

4                    **PLAINTIFF'S FIRST CAUSE OF ACTION**
    **(Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code §**
5                              **1750, *et seq*.)**
                        **On Behalf of Plaintiff and the Class**
6
7      96.   Plaintiff realleges and incorporates the paragraphs of this Class Action Complaint

8   as if set forth herein.

9      97.   Defendants' actions, representations and conduct have violated, and continue to

10  violate the CLRA, because they extend to transactions that are intended to result, or which have

11  resulted, in the sale or lease of goods or services to consumers.

12     98.   Plaintiff and other class members are "consumers" as that term is defined by the

13  CLRA in California Civil Code § 1761(d).

14     99.   The educational programs that Plaintiff (and other similarly situated class

15  members) purchased from Defendants are "services" within the meaning of California Civil Code

16  § 1761(b).

17     100.  By engaging in the actions, representations and conduct set forth in this Class

18  Action Complaint, Defendants have violated, and continue to violate, § 1770(a)(2), § 1770(a)(3),

19  § 1770(a)(5), § 1770(a)(7), § 1770(a)(9), § 1770(a)(14), and § 1770(a)(16) of the CLRA. In

20  violation of California Civil Code:

21     •      §1770(a)(2), Defendants' acts and practices constitute improper representations

22             regarding the source, sponsorship, approval, or certification of the services they

23             sold;

24     •      § 1770(a)(3), Defendants' acts and practices constitute misrepresentation regarding

25             the affiliation, connection, or association with, or certification by, another of the

26             services they sell;

27     •      §1770(a)(5), Defendants' acts and practices constitute improper representations

28             that the services they sell have sponsorship, approval, characteristics, uses,

                                        -22-

1   benefits, or quantities, which they do not have;

2   •   §1770(a)(7), Defendants' acts and practices constitute improper representations

3   that the services they sell are of a particular standard, quality, or grade, when they

4   are of another;

5   •   §1770(a)(9), Defendants have advertised their services with intent not to sell them

6   as advertised;

7   •   §1770(a)(14), Defendants have representing that a transaction confers or involves

8   rights, remedies, or obligations which it does not have or involve;

9   •   §1770(a)(16), Defendants have represented that a transaction has been supplied in

10   accordance with a previous representation when it has not;

11   In particular, Defendants violated each of these subsections by representing that NPU had

12   federally recognized accreditation without disclosing that (1) its accrediting agency was under

13   investigation by the DOE, (2) federal recognition for its accrediting agency was in jeopardy of

14   being revoked, (3) NPU had no back-up plan to obtain accreditation from any other federally

15   recognized accrediting agency if the DOE revoked its recognition of NPU's accrediting agency,

16   (4) if accreditation was revoked, students would be unable to obtain visa extensions or use NPU

17   degrees to pursue higher degrees at other institutions, (5) the DOE did in fact revoke federal

18   recognition for NPU's accrediting agency in December 2016, or (6) NPU is no longer accredited

19   by any federally recognized accrediting agency.

20   101.   Plaintiff requests that this Court enjoin Defendants from continuing to employ the

21   unlawful methods, acts and practices alleged herein pursuant to California Civil Code

22   § 1780(a)(2).

23   102.   Pursuant to Civil Code sections 3384 and 3386, which authorize the court to

24   provide specific performance to compel performance of an obligation, Plaintiff seeks, on behalf

25   of himself, those similarly situated, and the general public, an order compelling Defendants to (a)

26   obtain a new federally recognized accreditation and (b) issue new credits and new degrees to

27   Plaintiff and class Members after the date of such accreditation, based on previously earned credit

28   hours, without additional charge to Plaintiff or Class Members.

-23-

Class Action Complaint

103.   If Defendants are not restrained from engaging in these types of practices in the future, Plaintiff and the other members of the Class will continue to suffer harm.

104.   CLRA § 1782 NOTICE. **Irrespective of any representations to the contrary in this Class Action Complaint, Plaintiff specifically disclaims, at this time, any request for damages under any provision of the CLRA.** Plaintiff, however, hereby provide Defendants with notice and demand that within thirty (30) days from that date, Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Defendants' failure to do so will result in Plaintiff amending this Class Action Complaint to seek, pursuant to California Civil Code § 1780(a)(3), on behalf of himself and those similarly situated class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

105.   Plaintiff also requests that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

<u>**PLAINTIFF'S SECOND CAUSE OF ACTION**</u>
**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf of Plaintiff and the Class**

106.   Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

107.   Beginning at an exact date unknown to Plaintiff, but within three (3) years preceding the filing of the Class Action Complaint, Defendants made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of their educational programs.

108.   In particular, Defendants represented that NPU had federally recognized accreditation without disclosing that (1) its accrediting agency was under investigation by the DOE, (2) federal recognition for its accrediting agency was in jeopardy of being revoked, (3) NPU had no back-up plan to obtain accreditation from any other federally recognized accrediting agency if the DOE revoked its recognition of NPU's accrediting agency, (4) if accreditation was revoked, students would be unable to obtain visa extensions or use NPU degrees to pursue higher degrees at other institutions, (5) the DOE did in fact revoke federal recognition for NPU's

-24-

Class Action Complaint

1  accrediting agency in December 2016, and (6) NPU is no longer accredited by any federally

2  recognized accrediting agency.

3       109.    Plaintiff and those similarly situated relied to their detriment on Defendants' false,

4  misleading and deceptive advertising and marketing practices, including each of the

5  misrepresentations and omissions set forth in paragraphs 24-26, 53-58, and 78 above. Had

6  Plaintiff and those similarly situated been adequately informed and not intentionally deceived by

7  Defendants, they would have acted differently by, without limitation, not enrolled in Defendants'

8  educational programs, or, at a minimum, not paid as much, would have sought to transfer to other

9  universities, chosen not to complete their programs, or acted differently with respect to post-

10  graduate employment.

11       110.    Defendants' acts and omissions are likely to deceive the general public.

12       111.    *Defendants engaged in these false, misleading and deceptive advertising and*

13  marketing practices to increase its profits. Accordingly, Defendants have engaged in false

14  advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and

15  Professions Code.

16       112.    The aforementioned practices, which Defendants used, and continue to use, to

17  their significant financial gain, also constitutes unlawful competition and provides an unlawful

18  advantage over Defendants' competitors as well as injury to the general public.

19       113.    As a direct and proximate result of such actions, Plaintiff and the other class

20  members have suffered, and continue to suffer, injury in fact and have lost money and/or property

21  as a result of such false, deceptive and misleading advertising in an amount which will be proven

22  at trial, but which is in excess of the jurisdictional minimum of this Court.

23       114.    Plaintiff seeks, on behalf of himself and those similarly situated, full restitution of

24  monies, as necessary and according to proof, to restore any and all monies acquired by

25  Defendants from Plaintiff, the general public, or those similarly situated by means of the false,

26  misleading and deceptive advertising and marketing practices complained of herein, plus interest

27  thereon.

28       115.    Plaintiff seeks, on behalf of himself and those similarly situated, a declaration that

-25-

Class Action Complaint

1    the above-described practices constitute false, misleading and deceptive advertising.

2      116.    Plaintiff seeks, on behalf of himself and those similarly situated, an injunction to

3    require Defendants to provide them the promised degree from an institution of higher education

4    that has federally recognized accreditation, for example by (1) obtaining a new federally

5    recognized accreditation and (2) issuing new credits and new degrees to Plaintiff and class

6    Members after the date of such accreditation, based on previously earned credit hours, without

7    additional charge to Plaintiff or Class Members.

8      117.    Plaintiff seeks, on behalf of himself and those similarly situated, an injunction to

9    prohibit Defendants from continuing to engage in the false, misleading and deceptive advertising

10    and marketing practices complained of herein. Such misconduct by Defendants, unless and until

11    enjoined and restrained by order of this Court, will continue to cause injury in fact to the general

12    public and the loss of money and property in that Defendants will continue to violate the laws of

13    California, unless specifically ordered to comply with the same. This expectation of future

14    violations will require current and future consumers to repeatedly and continuously seek legal

15    redress in order to recover monies paid to Defendants to which they are not entitled. Plaintiff,

16    those similarly situated and/or other consumers nationwide have no other adequate remedy at law

17    to ensure future compliance with the California Business and Professions Code alleged to have

18    been violated herein.

19                 **PLAINTIFF'S THIRD CAUSE OF ACTION**
             **(Common Law Fraud, Deceit and/or Misrepresentation)**
20                  **On Behalf of Plaintiff and the Class**

21      118.    Plaintiff realleges and incorporates by reference the paragraphs of this Class

22    Action Complaint as if set forth herein.

23      119.    Throughout the last four years, Defendants fraudulently and deceptively informed

24    Plaintiff and the Class that NPU's educational program had federally-recognized accreditation.

25    Defendants failed to inform Plaintiff and the Class that (1) NPU's accrediting agency was under

26    investigation by the DOE, (2) federal recognition for its accrediting agency was in jeopardy of

27    being revoked, (3) NPU had no back-up plan to obtain accreditation from any other federally

28    recognized accrediting agency if the DOE revoked its recognition of NPU's accrediting agency,

1   (4) if accreditation was revoked, students would be unable to obtain visa extensions or use NPU

2   degrees to pursue higher degrees at other institutions, (5) the DOE did in fact revoke federal

3   recognition for NPU's accrediting agency in December 2016, and (6) NPU is no longer accredited

4   by any federally recognized accrediting agency.

5       120.    These misrepresentations and omissions were known exclusively to, and actively

6   concealed by, Defendants, not reasonably known to Plaintiff, and material at the time they were

7   made. Defendants' misrepresentations and omissions concerned material facts that were essential

8   to the analysis undertaken by Plaintiff and the Class as to whether to enroll in Defendants'

9   educational programs, complete such programs, and seek out certain educational and employment

10   opportunities. In misleading Plaintiff and the Class and not so informing Plaintiff and the Class,

11   Defendants breached their duty to them. Defendants also gained financially from, and as a result

12   of, their breach.

13       121.    Plaintiff and those similarly situated relied to their detriment on Defendants'

14   misrepresentations and fraudulent omissions. Had Plaintiff and those similarly situated been

15   adequately informed and not intentionally deceived by Defendants, they would have acted

16   differently by, without limitation, not enrolling, or, at a minimum, not paying as much, seeking to

17   transfer to other universities, choosing not to complete their programs, or acting differently with

18   respect to employment.

19       122.    By and through such fraud, deceit, misrepresentations and/or omissions,

20   Defendants intended to induce Plaintiff and those similarly situated to alter their position to their

21   detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiff and those

22   similarly situated to, without limitation, enroll in Defendants' educational programs.

23       123.    Plaintiff and those similarly situated justifiably and reasonably relied on

24   Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants.

25       124.    As a direct and proximate result of Defendants' misrepresentations and/or

26   omissions, Plaintiff and those similarly situated have suffered damages, including, without

27   limitation, the amount they paid for Defendants' educational programs (in tuition, fees and other

28   expenses, including relocation and living expenses).

1      125.    Defendants' conduct as described herein was wilful and malicious and was

2   designed to maximize Defendants' profits even though Defendants knew that it would cause loss

3   and harm to Plaintiff and those similarly situated.

4             **PLAINTIFF'S FOURTH CAUSE OF ACTION**

                  (Negligent Misrepresentation)

5             **On Behalf of Himself and the Class**

6      126.    Plaintiff realleges and incorporates by reference the paragraphs of this Class

7   Action Complaint as if set forth herein.

8      127.    At all times during the class period, Defendants provided false and misleading

9   information regarding its federally-recognized accreditation, leading Plaintiff and the Class to

10   believe that NPU would maintain such accreditation.

11      128.    These representations were material at the time they were made. They concerned

12   material facts that were essential to the analysis undertaken by Plaintiff and the Class as to

13   whether to enroll in Defendants' programs, pay the full price for the programs, complete their

14   course of study rather than transfer or withdraw, or to make decisions with respect to

15   employment.

16      129.    Defendants should have known that their representations were false and/or

17   misleading. Defendants had no reasonable grounds for believing those representations to be true

18   and non-misleading when they were made.

19      130.    By and through such negligent misrepresentations, Defendants intended to induce

20   Plaintiff and those similarly situated to alter their position to their detriment. Specifically,

21   Defendants negligently induced Plaintiff and those similarly situated to, without limitation, to

22   enroll in Defendants' programs, to complete their course of study rather than transfer or

23   withdraw, or to make decisions with respect to employment.

24      131.    Plaintiff and those similarly situated relied to their detriment on Defendants'

25   negligent misrepresentations. Had Plaintiff and those similarly situated been adequately informed

26   and not intentionally deceived by Defendants, they would have acted differently by, without

27   limitation, not paying as much, seeking to transfer to other universities, choosing not to complete

28   their programs, or acting differently with respect to post-graduate employment.

132. Plaintiff and those similarly situated have suffered damages, including, without limitation, the amount they paid for the educational programs. Defendants' negligent representations and omissions were a substantial factor in causing the damage.

## PLAINTIFF'S FIFTH CAUSE OF ACTION
### (Concealment)
### On Behalf of Himself and the Class

133. Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

134. Prior to and during the Class Period, Defendants knew but failed to disclose that (1) NPU's accrediting agency was under investigation by the DOE, (2) federal recognition for its accrediting agency was in jeopardy of being revoked, (3) NPU had no back-up plan to obtain accreditation from any other federally recognized accrediting agency if the DOE revoked its recognition of NPU's accrediting agency, (4) if accreditation was revoked, students would be unable to obtain visa extensions or use NPU degrees to pursue higher degrees at other institutions, (5) the DOE did in fact revoke federal recognition for NPU's accrediting agency in December 2016, and (6) NPU is no longer accredited by any federally recognized accrediting agency.

135. As set forth in paragraphs 53-54, Defendants knew that Class Members did not know and would be unlikely to know these facts. Plaintiff and those similarly situated did not know of these concealed facts.

136. In concealing these facts, Defendants intended to deceive Plaintiff and those similarly situated.

137. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, not paying as much, seeking to transfer to other universities, choosing not to complete their programs, or acting differently with respect to post-graduate employment.

138. Plaintiff and those similarly situated have suffered damages, including, without limitation, the amount they paid for the educational programs. Defendants' negligent representations and omissions were a substantial factor in causing the damage.

*Class Action Complaint*

## PLAINTIFF'S SIXTH CAUSE OF ACTION
### (Breach of Contract)
### On Behalf of Himself and the Class

139.   Plaintiff realleges and incorporates by reference the paragraphs of this Complaint as if set forth herein.

140.   In or around May 2015, Plaintiff Kalakanti entered into a contract with Defendants to study at and obtain a degree from a university with federally-recognized accreditation so that he could transfer to other universities, apply for jobs and graduate programs, and apply for visas.

141.   The terms of the contract were that the Plaintiff would complete the necessary coursework to complete his degree and in exchange Defendants would maintain accreditation so that these students could obtain the benefits of that accreditation at the time they would seek to transfer to other universities, complete their programs, apply for jobs and graduate programs, and apply for visas. Persons similarly situated to Plaintiff entered into contracts with the same agreement, other than varying admissions dates and coursework requirements.

142.   Defendants breached the contract by failing to preserve federally-recognized accreditation status through, at a minimum, the time that Plaintiff and the class graduated and would complete their three year post-graduation visa extension eligibility.

143.   As a direct and proximate result of the breaches set forth herein, Plaintiff, and those similarly situated, have suffered, and continue to suffer, damages in an amount which will be proven at trial, but which are in excess of the jurisdictional minimum of this Court.

144.   Ppursuant to Civil Code sections 3384 and 3386, which authorize the court to provide specific performance to compel performance of an obligation, Plaintiff also seeks, on behalf of himself, those similarly situated, and the general public, an order compelling Defendants to (a) obtain a new federally recognized accreditation and (b) issue new credits and new degrees to Plaintiff and Class Members after the date of such accreditation, based on previously earned credit hours, without additional charge to Plaintiff or Class Members.

-30-

Class Action Complaint

**PLAINTIFF'S SEVENTH CAUSE OF ACTION**
(Breach of the Duty of Good Faith And Fair Dealing)
On Behalf of Himself and the Class

145.   Plaintiff realleges and incorporates by reference the paragraphs of this Complaint as if set forth herein.

146.   Defendants solicited Plaintiff and the Class to enroll in their educational programs with federally-recognized accreditation.

147.   Plaintiff and the Class performed their end of the bargain by paying the tuition and fees demanded of them and completing their coursework and working towards their degrees.

148.   Defendants unfairly interfered with Plaintiff's rights and the rights to receive the benefits of enrolling in and completing educational programs with federally-recognized accreditation, by (1) failing to disclose the facts set forth in paragraph 26 and (2) failing to take necessary steps to maintain federally-recognized accreditation.

149.   As a direct and proximate result of Defendants' breach of the duty of good faith and fair dealing, Plaintiff and the Class have suffered damages, including, without limitation, the loss of money paid to Defendants.

150.   Further, pursuant to Civil Code sections 3384 and 3386, which authorize the court to provide specific performance to compel performance of an obligation, Plaintiff seeks, on behalf of himself, those similarly situated, and the general public, an order compelling Defendants to (a) obtain a new federally recognized accreditation and (b) issue new credits and new degrees to Plaintiff and class Members after the date of such accreditation, based on previously earned credit hours, without additional charge to Plaintiff or Class Members.

**PLAINTIFF'S EIGHTH CAUSE OF ACTION**
(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions
Code § 17200, *et seq.*)
On Behalf of Plaintiff and the Class

151.   Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

152.   Within four (4) years preceding the filing of this lawsuit, and at all times

-31-

Class Action Complaint

1 | mentioned herein, Defendants have engaged, and continue to engage, in unlawful, unfair, and

2 | fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent

3 | business practices outlined in this complaint.

4 |     153.   In particular, Defendants have engaged, and continue to engage, in unlawful

5 | practices by, without limitation,

6 |     •   Violating the CLRA as described herein;

7 |     •   Violating the FAL as described herein;

8 |     •   Violating 34 C.F.R. 668.72(a), which prohibits "[m]isrepresentations concerning

9 |        the nature of an eligible institution's educational programs," including "false,

10 |        erroneous or misleading statements concerning the "nature and extent of its

11 |        institutional, programmatic, or specialized accreditation."; and

12 |     •   Violating the common law of concealment; fraud, deceit or misrepresentation;

13 |        negligent misrepresentation, breach of contract, and breach of the duty of good

14 |        faith and fair dealing.

15 |     154.   In particular, Defendants have engaged, and continue to engage, in unfair and

16 | fraudulent practices by, without limitation, by (1) failing to disclose the facts set forth in

17 | paragraph 26 and (2) failing to take necessary steps to maintain federally-recognized

18 | accreditation..

19 |     155.   Plaintiff and those similarly situated relied to their detriment on Defendants'

20 | unlawful, unfair, and fraudulent business practices. Had Plaintiff and those similarly situated been

21 | adequately informed and not deceived by Defendants, they would have acted differently by,

22 | without limitation, not enrolling, not paying as much, seeking to transfer to other universities,

23 | choosing not to complete their programs, or acting differently with respect to post-graduate

24 | employment.

25 |     156.   Defendants' acts and omissions are likely to deceive the general public.

26 |     157.   Defendants engaged in these deceptive and unlawful practices to increase their

27 | profits. Accordingly, Defendants have engaged in unlawful trade practices, as defined and

28 | prohibited by section 17200, et seq. of the California Business and Professions Code.

158.   The aforementioned practices, which Defendants have used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

159.   As a direct and proximate result of such actions, Plaintiff and the other class members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiff and the class members lost the amount they paid to attend NPU.

160.   As a direct and proximate result of such actions, Defendants have enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

161.   Plaintiff seeks, on behalf of himself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiff, the general public, or those similarly situated by means of the deceptive and/or unlawful trade practices complained of herein, plus interest thereon.

162.   Plaintiff seeks, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

163.   Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit Defendants from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they were not entitled. Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows (except that Plaintiff disclaims any prayer for any type of damages under the CLRA as stated in paragraph 104):

1. A declaration that Defendants' above-described trade practices are fraudulent and/or unlawful.

2. Injunctive relief and/or specific performance to require Defendants to provide Plaintiff and Class Members the promised credits and degrees from an institution of higher education that has federally recognized accreditation, for example by (a) obtaining a new federally recognized accreditation and (b) issuing new credits and new degrees to Plaintiff and class Members after the date of such accreditation, based on previously earned credit hours, without additional charge to Plaintiff or Class Members.

3. Injunctive relief to prohibit Defendants from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein.

4. Restitution of amounts expended by Plaintiff and the Class

5. Compensatory damages, the amount of which is to be determined at trial;

6. [Reserved]

7. Punitive damages, the amount of which is to be determined at trial.

8. Reasonable attorneys' fees according to proof pursuant to, without limitation, the California Legal Remedies Act and California Code of Civil Procedure § 1021.5;

9. For costs of suit incurred; and

10. For such further relief as this Court may deem just and proper.

-34-

Class Action Complaint

1

## JURY TRIAL DEMANDED

2  Plaintiff hereby demands a trial by jury.

3  Dated: December 21, 2017          **GUTRIDE SAFIER LLP**

4

5                                     _____
   Adam J. Gutride, Esq.
6  Seth A. Safier, Esq.
   Kristen G. Simplicio, Esq.
7  100 Pine Street, Suite 1250
   San Francisco, CA 94111
8
   Attorneys for Plaintiff
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-35-



ENDORSED
FILED
ALAMEDA COUNTY

JAN 2 6 2018

CLERK OF THE SUPERIOR COURT
By: ERICA BAKER, Deputy

1  FLETCHER C. ALFORD  (SBN: 152314)
   falford@grsm.com
2  MARSHALL A. JOHNSON (SBN: 111612)
   majohnson@grsm.com
3  KEVIN LIU (SBN: 295287)
   kliu@grsm.com
4  GORDON & REES LLP
   275 Battery Street, Suite 2000
5  San Francisco, CA 94111
   Telephone: (415) 986-5900
6  Facsimile: (415) 986-8054

7  ATTORNEYS FOR DEFENDANT
   NORTHWESTERN POLYTECHNIC UNIVERSITY
8

9

10              SUPERIOR COURT OF CALIFORNIA - COUNTY OF ALAMEDA

11  ROHIT KALAKANTI, an individual, on behalf   )   CASE NO. RG17886977
    of himself, the general public and those similarly )
12  situated,                                    )   DEFENDANT NORTHWESTERN
                                                 )   POLYTECHNIC UNIVERSITY'S
13                       Plaintiff,              )   ANSWER TO COMPLAINT; DEMAND
                  vs.                            )   FOR JURY TRIAL
14                                               )
    NORTHWESTERN POLYTECHNIC               )   Assigned for all purposes to:
15  UNIVERSITY, PETER HSEIH [sic], PAUL    )   The Honorable Robert McGuiness
    CHOI, and DOES 1-50,                   )   Department 22
16                       Defendants.       )
                                           )

17  TO: ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

18          COMES NOW Defendant NORTHWESTERN POLYTECHNIC UNIVERSITY, a

19  California nonprofit public benefit corporation ("NPU" or "Defendant"), in answer to the Class

20  Action Complaint ("Complaint") filed by Plaintiff ROHIT KALAKANTI ("KALAKANTI" or

21  "Plaintiff") in this action responds as follows:

22                              **GENERAL DENIAL**

23          Pursuant to California Code of Civil Procedure Section 431.30(d), Defendant generally

24  and specifically denies each and every allegation contained in the Complaint and each and every

25  alleged cause of action therein, and further denies that Plaintiff is entitled to any of the relief

26  requested, that Defendant committed any wrongful conduct or omission, whether alleged or

27  otherwise, and denies that conduct or omissions of Defendant caused any injury or damage to

28  Plaintiff in the sum or manner alleged, or in any other sum or manner, at all.

                                       -1-
                    ANSWER TO COMPLAINT; JURY TRIAL DEMAND

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

FAXED
COPY

**AFFIRMATIVE DEFENSES**

Defendant further alleges the following separate and affirmative defenses to each and every cause of action alleged in the Complaint. By alleging the defenses set forth below, Defendant does not thereby agree or admit that it has the burden of proof, persuasion, or production with respect to any elements of any defense, or that Plaintiff has properly asserted any cause of action against Defendant.

**FIRST AFFIRMATIVE DEFENSE**

(Failure to State a Claim)

As a first, separate and distinct affirmative defense, Defendant alleges that Plaintiff's claims, and those of the purported class, are barred, in whole or in part, because the Complaint fails to allege facts sufficient to constitute a cause of action or to state a claim upon which relief may be granted against Defendant.

**SECOND AFFIRMATIVE DEFENSE**

(Estoppel)

As a second separate and affirmative defense, this answering Defendant alleges that Plaintiff is estopped by his conduct from recovering any relief in the Complaint.

**THIRD AFFIRMATIVE DEFENSE**

(Waiver)

As a third separate and affirmative defense, this answering Defendant alleges that by his conduct, Plaintiff has waived any right to recovery under the allegations of the Complaint.

**FOURTH AFFIRMATIVE DEFENSE**

(Unclean Hands)

As a fourth separate and affirmative defense, this answering Defendant alleges that Plaintiff has or had unclean hands with respect to the matters alleged in the Complaint and on that ground is barred from recovering any relief in his Complaint.

//

//

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1

## FIFTH AFFIRMATIVE DEFENSE

(Failure to Mitigate)

As a fifth separate and affirmative defense, this answering Defendant alleges that any recovery on Plaintiff's Complaint is barred, in whole or in part, by Plaintiff's failure to mitigate damages.

## SIXTH AFFIRMATIVE DEFENSE

(Statute of Limitations)

As a sixth separate and affirmative defense, Defendant alleges that each claim alleged in the Complaint is barred by all applicable statutes of limitations, including, but not limited to, California Code of Civil Procedure sections 337, 339, 340 and 343, California Business and Professions Code section 17208, and any other applicable statutes of limitation.

## SEVENTH AFFIRMATIVE DEFENSE

(Laches)

As a seventh separate and affirmative defense, this answering Defendant alleges that any recovery on Plaintiff's Complaint is barred, in whole or in part, by the equitable doctrine of Laches.

## EIGHTH AFFIRMATIVE DEFENSE

(Privilege and Justification)

As an eighth separate affirmative defense, this answering Defendant alleges that any recovery on Plaintiff''s Complaint is barred because this answering Defendant's disputed conduct was privileged or justified.

## NINTH AFFIRMATIVE DEFENSE

(Good Faith Actions)

As a ninth separate affirmative defense, this answering Defendant alleges that at all times mentioned herein, this answering Defendant acted reasonably and in good faith with regard to the acts and transactions which are the subject of the Complaint on file herein.

1

**TENTH AFFIRMATIVE DEFENSE**

2

(Contributory Negligence)

3

As a tenth separate affirmative defense, this answering Defendant is informed and

4

believes, and based upon such information and belief alleges that Plaintiff's damages, if any,

5

were caused by Plaintiff's own negligence, wrongful acts, failure to act, or omissions.

6

**ELEVENTH AFFIRMATIVE DEFENSE**

7

(Third Party Negligence)

8

As a eleventh separate affirmative defense, this answering Defendant is informed and

9

believes, and based upon such information and belief alleges that Plaintiff's damages, if any,

10

were caused by the negligence, wrongful acts or omissions of third parties.

11

**TWELFTH AFFIRMATIVE DEFENSE**

12

(Lack Of Justifiable Reliance)

13

As a twelfth, separate and distinct affirmative defense, Defendant alleges that Plaintiff is

14

barred from asserting each and every purported cause of action set forth in the Complaint

15

because he did not justifiably or detrimentally rely on any communication, conduct or omission

16

of Defendant.

17

**THIRTEENTH AFFIRMATIVE DEFENSE**

18

(Ill-Defined Classes)

19

As a thirteenth, separate and affirmative defense, Defendant alleges that the putative

20

classes and subclasses alleged in the Complaint are inadequately defined and not

21

administratively ascertainable.

22

**FOURTEENTH AFFIRMATIVE DEFENSE**

23

(Plaintiff Not Similarly Situated With Putative Members Of Alleged Classes)

24

As a fourteenth, separate and distinct affirmative defense, Defendant alleges that Plaintiff

25

is not similarly situated with members of the putative classes and subclasses that he purports to

26

represent. Therefore, this action is not properly certified or maintained as a class action.

27

//

28

//

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1

## FIFTEENTH AFFIRMATIVE DEFENSE

2

(No Typicality)

3

As a fifteenth, separate and distinct affirmative defense, Defendant alleges that the

4

claims of the named Plaintiff are not typical of the claims of the members of the putative classes

5

and subclasses alleged in the Complaint and that therefore this action is not properly certified or

6

maintained as a class action.

7

## SIXTEENTH AFFIRMATIVE DEFENSE

8

(No Numerosity)

9

As a sixteenth, separate and distinct affirmative defense, Defendant alleges that the

10

putative classes and subclasses alleged in the Complaint are not so numerous that joinder of all

11

members is impracticable and therefore, Plaintiff cannot meet the prerequisites to a class action

12

set forth in section 382 of the California Code of Civil Procedure.

13

## SEVENTEENTH AFFIRMATIVE DEFENSE

14

(No Commonality)

15

As a seventeenth, separate and distinct affirmative defense, Defendant alleges that there

16

are not questions of law or fact common to the putative classes and sub-classes alleged in the

17

Complaint and therefore, Plaintiff cannot meet this prerequisite to maintaining a class action.

18

## EIGHTEENTH AFFIRMATIVE DEFENSE

19

(Predominance Of Individualized Questions)

20

As an eighteenth, separate and distinct affirmative defense, Defendant alleges that

21

individualized questions of fact and law predominate over any purported common questions in

22

this action, and therefore, Plaintiff cannot meet the prerequisites to a class action.

23

## NINETEENTH AFFIRMATIVE DEFENSE

24

(Not A Suitable Class Representative)

25

As a nineteenth, separate and affirmative defense, Defendant alleges that Plaintiff is

26

not a suitable class representative, and therefore, Plaintiff cannot satisfy the prerequisites to a

27

class action.

28

//

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

## TWENTIETH AFFIRMATIVE DEFENSE

(Difficulties Of Proposed Class Action)

As a twentieth, separate and distinct affirmative defense, Defendant alleges that this case is not properly maintained as a class action because of the difficulties likely to be encountered in the management of a class action.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

(No Question Of Common Or General Interest)

As a twenty-first separate and distinct affirmative defense, Defendant alleges that the Complaint does not raise any question of common or general interest suitable for class treatment under California Code of Civil Procedure § 382.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

(Reservation of Additional Affirmative Defenses)

As a twenty-second separate and affirmative defense, this answering Defendant alleges that it presently has insufficient knowledge or information on which to form a belief as to whether it may have additional, and as yet unstated, affirmative defenses available. Defendant reserves herein the right to assert additional defenses in the event that discovery and investigation indicate that additional defenses would be appropriate.

WHEREFORE, this answering Defendant prays for judgment as follows:

1.     That Plaintiff takes nothing by way of his Complaint on file herein;

2.     For costs of suit incurred herein:

3.     For reasonable attorney's fees; and

4.     For such further relief as the court may deem just and proper.

## JURY TRIAL DEMANDED

Defendant  Northwestern Polytechnic University hereby demands a trial by jury as to all

//

//

//

//

-6-

1   issues and causes of action in this action.

2

3   Dated:  January 26, 2018                          GORDON & REES LLP

4

5   By_____

6                                                    Fletcher C. Alford
                                                     Marshall A. Johnson
7                                                    Kevin Liu
                                                     ATTORNEYS FOR DEFENDANT
8                                                    NORTHWESTERN POLYTECHNIC
                                                     UNIVERSITY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon & Rees LLP**
**275 Battery Street, Suite 2000**
**San Francisco, CA 94111**

-7-

ANSWER TO COMPLAINT; JURY TRIAL DEMAND

1

## PROOF OF SERVICE

2

3          I am a resident of the State of California, over the age of eighteen years, and not a party
to the within action.  My business address is: Gordon Rees Scully Mansukhani, LLP 275 Battery
4     Street, Suite 2000, San Francisco, CA 94111.  On said date below, I served the within
documents:

5     **DEFENDANT NORTHWESTERN POLYTECHNIC UNIVERSITY'S ANSWER TO
COMPLAINT; DEMAND FOR JURY TRIAL**

6

7     ☐     by transmitting via facsimile the document(s) listed above to the fax number(s) set
            forth below on this date before 5:00 p.m.

8     ☐     by causing to be served by hand via messenger document(s) listed above to the
            person(s) at the address(es) as set forth below.

9
      ☒     by placing the document(s) listed above in a sealed envelope with postage thereon
10          fully prepaid, in United States mail in the State of California at , addressed as set forth
            below.

11    ☐     by placing a true copy thereof enclosed in a sealed envelope, at a station designated
            for collection and processing of envelopes and packages for overnight delivery by
12          FedEx as part of the ordinary business practices of Gordon & Rees LLP described
            below, addressed as follows:
13

14          **Attorneys for Plaintiff:**
            Adam J. Gutride
15          Seth A. Safier
            Kristen G. Simplicio
16          Gutride Safier LLP
            100 Pine Street, Suite 1250
17          San Francisco, CA 94111
            Phone:  (415) 639-9090
18          Fax: (415) 449-6469
            Email: adam@gutridesafier.com

19          I am readily familiar with the firm's practice of collection and processing correspondence
for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same
20     day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on
motion of the party served, service is presumed invalid if postal cancellation date or postage
21     meter date is more than one day after the date of deposit for mailing in affidavit.

22          I declare under penalty of perjury under the laws of the State of California that the above
is true and correct.
23

24          Executed on January 26, 2018 at San Francisco, California.

25

26                                                            Maria Deang

27

28

1063299/36433466v.1

-8-